# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan H. Lefkow | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 CR 481 | **DATE** | 5/27/2004 |
| **CASE TITLE** | USA vs. Brock Okennard | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. For the reasons stated in the Memorandum Opinion and Order, the Court finds that defendant is competent to stand trial. This order is without prejudice to another motion by defense counsel under the conditions set out. Defendant is directed to cooperate with counsel in a sincere effort to assist him in preparing a defense.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | 2 | Document Number |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | MAY 28 2004 | |
| | Notified counsel by telephone. | | date docketed | |
| | Docketing to mail notices. | | | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | 5/27/2004 | |
| | | | date mailed notice | |
| MD | courtroom deputy's initials | | MD | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) <br> ) <br> vs. ) <br> ) <br> BROCK E. O'KENNARD, ) <br> ) <br> Defendant. ) <br> ) | No. 02 CR 481 <br> Judge Joan H. Lefkow |

DOCKETED
MAY 2 8 2004

## MEMORANDUM OPINION AND ORDER

Defendant, Brock O'Kennard ("O'Kennard" or "defendant"), has been charged in a two-count indictment with armed robbery of a TCF Bank in Chicago on May 11, 2002, in violation of 18 U.S.C. § 2113(a) and (d), and with use of a firearm during the commission of a felony, in violation of 18 U.S.C. §924(c)(1)(A)(ii) and (iii). Before the court is the issue of O'Kennard's competency to stand trial.

The United States Attorney maintains that O'Kennard is competent. Defendant, by his counsel, resting on independent psychiatric and psychological examinations, submits that O'Kennard is not competent. Following a hearing pursuant to 18 U.S.C. § 4241(a) the court, having considered all of the evidence and for the reasons set forth below, concludes that O'Kennard is competent to stand trial.

## BACKGROUND

On May 15, 2003, defendant appeared before the court for an initial appearance before United States Magistrate Judge Nan R. Nolan. Counsel, Steven M. Mondry, was appointed on

June 18, 2003. The indictment was returned on June 14, 2003 and defendant was arraigned on June 18. On July 8, counsel for defendant filed a motion for a mental health examination, stating that he was giving notice under Federal Rule of Criminal Procedure 12.2 that he intended to raise the defense of insanity at the time of the offense and to offer expert testimony concerning the defendant's mental disease or defect. The motion was granted on July 15 and an order was entered pursuant to 18 U.S.C. 4141 and 4242 that the Federal Medical Center of the Bureau of Prisons (FMC) conduct a psychiatric and psychological examination of defendant to determine not only his sanity at the time alleged offense but also his competency to stand trial. O'Kennard was observed over an approximately three-month period beginning July 2, 2002, at FMC, Rochester, Minnesota, and evaluated by Daniel Carlson, Psy. D., a psychologist. On December 16, 2002, Mr. Mondry filed a motion for mental health reexamination, asserting that after several meetings with defendant, counsel "strongly believes Mr. O'Kennard is currently suffering from a mental disease or defect, which prevents him from fully appreciating the nature and consequences of the proceedings against him, but more importantly [renders him] unable to assist properly in his defense." This motion was granted and defendant was examined during December, 2003, by Johnathan Gamze, M.D., a psychiatrist, and Leonard Koziol, Psy. D., a psychologist. On motion of the Government, the defendant was re-examined during March, 2003, by Dr. Stafford Henry, Ph.D., a clinical and forensic psychologist. Thereafter, a competency hearing was held at which all of the examiners testified as well as defendant's mother, Barbara J. O'Kennard, and FBI Special Agent Jerry Getz.

2

## Summary of the Evidence

The defendant's background, according to the various reports, is that he is 23 years of age (his mother gave his date of birth as May 30, 1980). He was reared principally by his maternal grandparents, he attended schools in Chicago, was graduated from high school and attended some courses in a community college during the year prior to the arrest. His grandmother's recent death in May, 2002 caused him great grief and her death was followed shortly by the death of a paternal grandparent. At the time of the arrest, he was living in his mother's home. He has minimal employment history and a record of arrests for minor offenses. All examiners reported having difficulty obtaining basic information from the defendant, though there are few disparities among them in this respect.

The four examiners also made similar observations during their interviews with the defendant. He presented as uncommunicative with blunted affect. His behavior was calm, as opposed to agitated. He was unresponsive or dramatically slow in responding to questions, often saying, "Huh?" as if he did not understand, and then responding after one or more repetitions, often with non-responsive, vague, inappropriate or improbable answers. For example, he told Dr. Carlson that he did not know his recently deceased grandmother's name, didn't know his height, and gave an unrealistically low body weight of 100 pounds. His reported date of birth was inconsistent with his mother's testimony. To some extent, he did not seem to be oriented as to date, month and year, although he knew he was "in jail."

Defendant appeared to be experiencing auditory hallucinations while in conference with Dr. Carlson.[1] Dr. Henry reported that he appeared to be having both visual and auditory hallucinations. Defendant told Dr. Gamze that he had been hearing male voices in his left ear for a year, which were constant, threatening harm to him and telling him to "do bad stuff all the time." He wanted the voices to stop but could not make them go away. He asked Dr. Carlson if he too heard the voices.[2] He also reported voices to Agent Getz after the arrest, indicating that the voices told him to commit the crime.

On cross examination, defendant's mother testified that defendant had reported to her about a year preceding the bank robbery that he felt he needed medication like that of his brother Christopher. Christopher, age 18, "was diagnosed with hearing voices as of late last year." Tr. at 43. Mrs. O'Kennard also reported that defendant's father and brother have received medical treatment for "hearing voices" and that the father was diagnosed in California with schizophrenia and/or bi-polar disorder.

Mrs. O'Kennard reported that, during the six months preceding the bank robbery, her son had gone into "isolation," was "closing down," in a depression, unlike his normal "outgoing" and "energetic" manner. She noticed that after two grandparents died and he lost his job, all in May 2002, he "totally shut down," provoking her to make an appointment with a psychiatrist. Mrs. O'Kennard testified that defendant did not go to the appointment because it was the morning

---

[1] He also reported hallucinations to Dr. Pindelski when he was first evaluated at MCC after his arrest.

[2] Dr. Pindelski reported that defendant stated that his auditory hallucinations usually occurred at sleep onset and termination. (This is not indicative of schizophrenia, according to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition ("DSM-IV"™) (1994), at 275.)

4

after the arrest and he was in custody.[3] On cross examination, Mrs. O'Kennard was asked whether Brock had ever reported to her that he was hearing voices. Mrs. O'Kennard responded that a little more than a year before the robbery, "[h]e did tell me, . . . 'Ma, I believe I need to go to the doctor, and I may need medication like Christopher.'" Tr. 50-51. Mrs. O'Kennard could recall no specifics about the voices, although she later said that he told her two times about voices. *Id.* at 51.

Although defendant has completed secondary education, and his mother stated he was a C student, when Dr. Carlson tested his reading skills, he scored at a kindergarten level. Dr. Carlson administered a variety of tests, the results of which, he believed, pointed to "malingering." Because defendant scored considerably lower on the tests than would be expected from merely random answers, Dr. Carlson inferred that defendant purposely answered incorrectly.

The examiners obtained similar information when they questioned defendant about his understanding of the court system. When Dr. Carlson asked him questions about the role of the lawyer, the prosecutor and the judge, for example, he responded with "Huhs" and delays, then gave "nonsensical and immature" answers, such as the prosecutor is "prostitute" and "Judge hit a hammer." He gave similar responses to Dr. Henry, although he indicated that both the defense lawyer and the prosecutor would help him. He thought the judge would yell at him because "I make her mad." He told Dr. Gamze he did not understand why he was in jail, he could not elaborate on the role of a defense attorney, the "prostitute" was there "to send you to jail," the

---

[3]Defense counsel, at the court's request, endeavored to corroborate that this appointment was made but was unable to do so. He learned that the physician had scheduled an appointment for defendant's brother, Christopher, and the physician stated that he saw other family members under the name Christopher "for insurance purposes," that he was treating Christopher and had never treated Brock O'Kennard. This is inconsistent with Dr. Gamze's report where he notes that Mrs. O'Kennard told him that this psychiatrist had treated defendant with Ritalin to help him focus better.

5

judge "always sends people to jail," and the jury are there for "clapping and stuff." In short, his responses on their face fell far short of basic understanding of legal proceedings.

In addition to the professional opinions of Dr. Carlson and Dr. Henry that defendant is malingering, the government offered into evidence transcripts of recorded telephone conversations that occurred at the MCC between the defendant and his mother on May 16, 2002, shortly after the arrest, and on September 16, 19, and 29, 2003. These conversations demonstrate that defendant understood and gave appropriate responses in normal conversation. He also made reference to legal proceedings that indicated he knew what "court" and "lawyer" meant. (In the September 29 conversation, defendant asked, "Did you call the lawyer?" (P. 3, l. 17) On September 16, he referred to a co-inmate, "... his brother have court [tomorrow]." (P. 2, l. 22).)

Agent Getz testified that after the arrest, defendant was hospitalized for gunshot wounds. For approximately one-and-a-half hours at the hospital, he was within hearing distance of the defendant during conversations with treating physicians. He observed that defendant interacted appropriately with them, appeared to be oriented, and made no bizarre references to voices or "Lucifer." Afterwards, Agent Getz interviewed defendant at the Homewood police station. Initially, defendant signed an advice of rights, stating that he understood it. During the interview, however, defendant professed to hear voices from "Lucifer," and he said he had found the gun that he used during the robbery. Suspecting "faking," Agent Getz spoke with defendant's brother Edward (who had also been arrested but was released). Edward told Agent Getz he was unaware of defendant's having mental problems. Edward was allowed to speak with the defendant and the two engaged in a five-minute conversation overheard by the agents, during which defendant said nothing about Lucifer or voices. The interrogation continued after this

conversation and defendant made no more reference to hallucinations but rather gave and signed a confession.

Both Dr. Carlson and Dr. Henry reached the conclusion, based on all the evidence, that defendant is malingering. According to the DSM-IV™, malingering "is the intentional production of false or grossly exaggerated physical or psychological symptoms, motivated by external incentives such as . . . evading criminal prosecution . . . . Malingering should be strongly suspected if any combination of the following is noted:

1. Mediocolegal context of presentation (e.g., the person is referred by an attorney to the clinician for examination)

2. Marked discrepancy between the persons' claimed stress or disability and the objective findings

3. Lack of cooperation during the diagnostic evaluation and in complying with the prescribed treatment regimen

4. The presence of Antisocial Personality Disorder.

DSM-IV™ at 683.

Dr. Carlson based his opinion on the observed behavior of defendant at FMC over a six-week period, including observations (presumably of custodians) that defendant functioned independently on the open unit and interacted normally with other inmates and staff at FMC, and his contrasting lack of cooperation or inconsistent behavior with Dr. Carlson.

Dr. Koziol disagreed with Dr. Carlson's conclusions that defendant was merely malingering because "an attempt was really not made to systematically look at his thinking functions in any of those evaluations." Dr Koziol interpreted the test information (Dr. Carlson's tests as well as his own) as demonstrating that defendant has a "very disturbed focus of attention,

7

meaning that he cannot pay attention to the right information at the right time during the course of a communication" and "he has a thought disorder, meaning that he is unable to think in a logical way." Tr. of Dec. 5, 2003 at 11. Because of his inability to focus, Dr. Koziol believed that defendant could not cooperate with counsel either by understanding what counsel said to him or by expressing himself back to counsel. Tr. 13.

Dr. Gamze interpreted defendant's behavior as indicative of schizophrenia, undifferentiated type. According to the DSM-IV™,

> The characteristic symptoms of Schizophrenia involve a range of cognitive and emotional dysfunctions that include perception, inferential thinking, language and communication, behavioral monitoring, affect, fluency and productivity of thought and speech, hedonic capacity, volition and drive, and attention. No single symptom is pathognomonic[4] of Schizophrenia: the diagnosis involves the recognition of a constellation of signs and symptoms associated with impaired occupational or social functioning.

*Id.* at 274. Diagnostic Criterion A requires positive symptoms of delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, and negative symptoms of "affective flattening, alogia, or avolition." *Id.* at 285. Diagnosis is indicated if "[t]wo or more of the symptoms are each present for a significant portion of time during a 1-month period. See ¶ 295.90 ("The essential feature of the Undifferentiated Type of Schizophrenia is the presence of symptoms that meet Criterion A of Schizophrenia but that do not meet the criteria for Paranoid, Disorganized, or Catatonic Type.")

> "Auditory hallucinations are usually experienced as voices, whether familiar or unfamiliar, that are perceived as distinct from the person's own thoughts. The content may be quite variable, although pejorative or threatening voices are especially common. Certain types of auditory hallucinations (i.e., commentary on

---

[4]Pathognomy is "the study or recognition of emotions and passions through their outward signs or expression." WEBSTER'S THIRD NEW INT'L DICTIONARY (1981). "Indicative" would be a useful synonym here.

8

> the person's thoughts or behavior) have been considered to be first-rank
> symptoms. If these types of hallucinations are present, then only this single
> symptom is need to satisfy Criterion A.") . . . .

*Id.* at 275. "Individuals with an early age onset are more likely male and have a poorer premorbid adjustment, lower educational achievement, more evidence of structural brain abnormalities, more prominent negative signs and symptoms, more evidence of cognitive impairment as assessed with neuropsychological testing, and a worse outcome. . . . Early in the illness, negative symptoms may be prominent, appearing primarily as prodromal features. Subsequently, positive symptoms appear." *Id.* at 282.

Dr. Gamze reached the diagnosis of schizophrenia based on the history provided by defendant's mother, as well as the mental status examination he conducted, and to some extent Dr. Koziol's report. According to Dr. Gamze's report, Mrs. O'Kennard told him that defendant had, over the course of the past year, significantly withdrawn into himself and seemed very depressed, even suicidal, beginning about May, 2002. She told him that defendant began hearing voices one year ago (*i.e.*, February 2003), although he had never described them to her. Mrs. O'Kennard also told him the defendant's father was either bi-polar or schizophrenic. She reported that defendant's brother was then under psychiatric care, having experienced hallucinations and been diagnosed with schizophrenia. Dr. Gamze stated that schizophrenia is more likely in children of a schizophrenic parent than in the general population. He also noted that defendant said little during the interview, seemed confused, displayed a blunted range of emotions, and reported paranoid delusions. Tr. 65-68.

Unlike his interviews with Dr. Carlson and Dr. Henry, Dr. Gamze did not note in his report that defendant manifested an episode of hearing voices. Dr. Gamze, however, probed the

9

matter in some detail. Defendant told him that the voices were "men's voices," that they are there all the time and he cannot make them go away, they tell him to do "take stuff" and "just take it." "The voices holler at him, even though he is not doing anything wrong."[5]

Dr. Gamze disagreed with those who believe defendant is malingering because of the information that he had deteriorated over a period of one year, that he acted consistently among all the examiners, even when with his lawyer (suggesting that the motive to malinger would not be present in an attorney-client context), and Dr. Koziol's tests indicating a thought disorder rather than malingering. Dr. Gamze conceded, however, that had he known that the night before the robbery defendant was watching a video of a jewel theft and told his brother it would be easy to rob a TCF bank, it might have made a difference in his diagnosis. He acknowledged that defendant after the robbery gave a complete statement to the FBI about why he robbed the bank even though he at first claimed to be hearing voices while being questioned. Although he initially indicated that he did not give substantial credit to the confession because it was not in defendant's own handwriting, Dr. Gamze stated that he had considered the statement in reaching his diagnosis.

## DISCUSSION

Title 18, United States Code, section 4241, provides in pertinent part:

> (a) **Motion to determine competency of defendant.**–At any time after the commencement of a prosecution for an offense and prior to the sentencing of the defendant, the defendant or the attorney for the Government may file a motion for hearing to determine the mental competency of the defendant. The court shall

---

[5] Dr. Carlson's report does not indicate that he probed the matter of voices in any detail. Dr. Henry reports that defendant was "evasive" of his inquiry into details about the voices. Dr. Henry also quotes from Dr. Pindelski's initial examination at the MCC, "During the interview, he also reported experiencing auditory hallucinations, mostly around sleep onset and termination. He was unable to discuss specifics of the experience without prompting, again suggesting a malingered presentation." Henry Report at 6, ¶5.

> grant the motion, or shall order such a hearing on its own motion, if there is reasonable cause to believe that the defendant may presently be suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense.
>
> **(b) Psychiatric or psychological examination and report.**–Prior to the date of the hearing, the court may order that a psychiatric or psychological examination of the defendant be conducted, and that a psychiatric or psychological report be filed with the court, pursuant to the provisions of section 4247 (b) and (c).
>
> \*     \*     \*
>
> **(d) Determination and disposition.**—If, after hearing, the court finds by a preponderance of the evidence that the defendant is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, the court shall commit the defendant to the custody of the Attorney General. The Attorney General shall hospitalize the defendant for treatment in a suitable facility . . . .

The burden falls on the United States to show by a preponderance of the evidence that O'Kennard is competent to stand trial. *See United States* v. *Teague*, 956 F.2d 1427, 1432 & n.10 (7th Cir. 1992); *United States ex rel. S.E.C.* v. *Billingsley*, 766 F.2d 1015, 1023-24 & n.10 (7th Cir. 1985); *United States ex rel. Bilyew* v. *Franzen*, 686 F.2d 1238, 1244 (7th Cir. 1982).

Under section 4241(d), if the court finds (a) that the defendant suffers from a mental disease or defect (b) that renders him . . . unable to understand the nature and consequences of the proceedings against him or (c) to assist properly in his defense, the defendant must be committed to the custody of the Attorney General for treatment in a suitable facility. A defendant is competent to stand trial if he "has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." *Cooper* v. *Oklahoma*, 517 U.S. 348, 354 (1996),

11

citing *Dusky* v. *United States*, 362 U.S. 402 (1960). Merely having a mental illness is not enough to declare a defendant incompetent. *E.g.*, *United States* v. *Leggett*, 162 F.3d 237, 244 (3rd Cir. 1998) ("[A]n axiom [is] generally observed by courts: *i.e.*, [i]t does not follow that because a person is mentally ill [that person] is not competent to stand trial.") (internal quotations marks omitted). Rather, the illness must impair the defendant's ability either to understand the nature and consequences of the proceeding or to assist properly in his defense. *See United States* v. *Timmins*, 301 F.3d 974, 979 (9th Cir. 2002) (Shadur, J. sitting by designation) (pointing out that the test consists of two prongs: understanding the proceedings and cooperation with counsel). Factors the court may consider include, *inter alia*, testimony from psychiatrists, the defendant's behavior–both before the court and elsewhere– intelligence, lapses of memory, and unresponsiveness. *United States* v. *Blohm*, 579 F. Supp 495, 500 (S.D.N.Y. 1993). This court has also considered defense counsel's observations. *But see Timmins*, 301 F.3d at 981 ("[A] lawyer is not a trained mental health professional capable of accurately assessing the effects of paranoid delusions on the client's mental processes.")

A. **Ability to Understand the Nature and Consequences of the Proceeding**

The issue here is whether the defendant is malingering or whether this behavior is genuine and symptomatic of schizophrenia. The preponderance of the evidence is that defendant is malingering. The reasons for this are several. In order to credit Dr. Gamze's diagnosis, this court must credit the evidence that defendant hears voices. The evidence of this is equivocal. Family members, who have had the greatest opportunity to observe, had little to offer. Edward O'Kennard was unaware that the defendant had mental problems. Defendant's mother could describe nothing specific about voices, nothing recent, and actually said nothing about voices

during her direct examination. From a layman's perspective, Mrs. O'Kennard described a deeply depressed son. Defendant's own manifestations of voices seem to be selective. Because defendant's brother Christopher is being treated for schizophrenia, defendant is likely aware of the phenomenon of hearing voices. He manifested presently hearing voices with individuals who are aligned with the government: Dr. Henry, Dr. Carlson, Dr. Pindelski and Agent Getz, but he apparently did not do that with the examiners he more likely trusted, Dr. Koziol and Dr. Gamze and the hospital physicians. The incident described by Agent Getz, where defendant abandoned the voices after he spoke with his brother who advised him to be cooperative, suggests that defendant initially invoked the voices to explain his conduct.

The court is also influenced towards a finding of malingering by the testing which Dr. Carlson conducted. Although it may be true that the tests have not been validated for psychotic patients as Dr. Koziol observed, one would still expect that defendant's scores on the tests would have been more random if he truly did not understand what he was doing. Dr. Koziol inferred from defendant's ability to do math on paper although he could not do the same tasks in his head that he could not initially register information. This would suggest at least that he should be able to perform a written test of reading ability, but with Dr. Carlson he could not read above kindergarten level. The court has found nothing in the DSM-IV description of Schizophrenia that suggests that a dramatic drop in intellectual functioning is characteristic.

Of the criteria for malingering set out above, three are present: a medico-legal context, marked discrepancy between defendant's claimed disability and the objective findings of apparently normal behavior when not under examination, and apparent lack of cooperation during the diagnostic evaluation (although no treatment regimen has yet been prescribed). To be

13

sure, a conclusion of malingering rests on which evidence is credited, such as whether the court believes defendant was being uncooperative as opposed to unable to cooperate during the examinations. In light of all the evidence, however, the court is persuaded that the evidence of malingering has somewhat more force than the evidence of mental disease or defect.

If the court is correct that malingering is influencing defendant's behavior, then it follows that his mental functioning, with respect to the first prong of the competency analysis, is adequate to understand the nature and the consequences of the proceedings against him. As indicated in the facts, defendant in a phone conversation appeared to know what courts and lawyers were, which make his bizarre responses to the examiners incredible. Further, the evidence that defendant conducts himself normally while in confinement also makes his bizarre conduct seem incredible. For these reasons, the court concludes that the first prong of the competency test is satisfied.

### B. Ability to Properly Assist in Defense

The court confronts much more difficulty on the other prong of the competency test, whether defendant has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding. As the court points out in *Timmins*, 301 F.3d at 979, "[This] requirement, though less frequently focused on in the case law,[6] adds independent content to the judicial inquiry beyond the first . . . factor."

Cooperation with counsel has been described as "the capacity to provide whatever assistance counsel requires in order to explore and present an adequate defense." R. Bonnie,

---

[6] Indeed, this court finds no decision of the Seventh Circuit that treats this prong distinctly from the understanding prong.

*"The Competence of Criminal Defendants: Beyond* Dusky *and* Drope," 47 U. MIAMI L. REV. 539, 552 (1993); *see also, Dusky*, 362 U.S. at 402. Components of such capacity necessarily include the fundamentals addressed above, that of understanding the nature and possible consequences of the proceeding. In relation to cooperation with counsel, these capacities are put to the test, particularly when defendant is faced with choices whether to waive constitutional rights, such as to waive the right to counsel, to plead guilty or go to trial, to waive a jury, to cross-examine witnesses, and to testify in his own defense. *See Godinez* v. *Moran*, 509 U.S. 389, 399 (1993) (identifying choices which criminal defendants face). Defendant's counsel has firmly stated that he has been unable to gain defendant's cooperation, and he believes it is attributable to a mental illness. Counsel's interactions with the defendant have been interrupted by this long competency proceeding, and it is possible that the communication going forward will be improved. In any event, the court makes a provisional finding that defendant is capable of cooperating with counsel. Of course it may ultimately be shown that counsel is unable to obtain from defendant the assistance he requires in order to explore and present an adequate defense. If that becomes the case, then alternatives must be explored.

## CONCLUSION AND ORDER

The court finds that defendant is competent to stand trial. This order is without prejudice to another motion presented by defense counsel under the conditions set out in the preceding paragraph. Defendant is directed to cooperate with counsel in a sincere effort to assist him in preparing a defense.

ENTER:

_____
JOAN HUMPHREY LEFKOW
United States District Judge

Dated: May 27, 2004